# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 26, 2022 Session

## STATE OF TENNESSEE v. RICKEENA HAMILTON

**Appeal from the Criminal Court for Knox County**
**No. 114211   Steven Wayne Sword, Judge**

_____

### No. E2021-00409-CCA-R3-CD

_____

Defendant, Rickeena Hamilton, appeals her convictions for second degree murder and tampering with evidence and her effective twenty-eight-year sentence.   On appeal, Defendant contends that (1) the evidence is insufficient to support her conviction for second degree murder; (2) the State improperly introduced speculative and improper opinion testimony from fact witnesses; (3) the trial court erred in admitting evidence that Defendant declined to make a statement following her arrest; (4) the trial court issued multiple erroneous jury instructions; (5) the State made improper comments during closing arguments; (6) the trial court imposed an excessive sentence; and (7) the cumulative effect of the errors warrants relief.   We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined.  JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Eric Lutton, District Public Defender; and Johnathan Harwell, Assistant Public Defender (on appeal); and Joseph A. Fanduzz, Knoxville, Tennessee (at trial), for the appellant, Rickeena Hamilton.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Sean McDermott and Kevin Allen, Assistant District Attorneys General, for the appellee, State of Tennessee.

_____

[1] The Honorable John Everett Williams, Presiding Judge of the Court of Criminal Appeals, passed away on September 2, 2022, and did not participate in this opinion.  We acknowledge his faithful service to this Court.

# OPINION

## I. Factual and Procedural Background

Defendant was charged with second degree murder for killing the victim, Timothy Chaz Cox, by stabbing him in his neck on June 17, 2018, following an altercation at Bull Feathers, a bar located in Knoxville, Tennessee. Defendant fled the scene and threw the knife into a dumpster, and she also was charged with tampering with evidence as a result.

## Trial

According to the evidence presented at trial, the twenty-two-year-old victim worked as a car salesman with his father, Timothy Cox, and the victim's girlfriend was pregnant with his first child. Sunday, June 17, 2018, was Father's Day, and the victim and his father ate lunch together and then went to Bull Feathers, where they ordered two "buckets" of beer and played pool. They later were joined by Tracy Cox, the victim's mother, and David Nabors, a coworker of the victim and his father.

Bull Feathers had an "L-shaped" bar near the front entrance, and tables and chairs were placed throughout the area. Two pool tables were located past a karaoke booth in the back of the bar. A room with dartboards was located next to the pool tables. Hannah Powell, the manager of Bull Feathers, testified that exits were located at the front of the bar, in the nonsmoking section, and near the restrooms in the back. She agreed that the closest exit near the pool tables was by the restrooms.

The victim's mother testified that she was at Bull Feathers for approximately one and one-half to two hours when a group that included Defendant arrived. The group was celebrating a birthday and acting "all wild and crazy." Olia Hutson, a member of the group, testified that earlier in the day, she and Defendant went shopping and stopped by the Moonshine Bar where they drank free samples of moonshine. They then went to a bar where they continued to drink alcohol. Ms. Hutson said that because she was driving, she only had two or three drinks throughout the day. She stated that the group was kicked out of the bar after another member of the group was "caught doing something in the restroom, some sexual manner." Ms. Hutson then suggested that they go to Bull Feathers. When the group arrived, they sat at a table near the pool tables where the victim, his parents, and Mr. Nabors had gathered. Ms. Hutson recognized the victim and had spoken to him on a prior occasion.

The victim's father and mother testified that a woman from the group approached them and kissed the victim's mother on her mouth. The victim's mother said that although she did not like the woman's kissing her, she did not want to "start anything" and "just let

it go at that." The woman then kissed Mr. Nabors, the victim's father, and the victim on their mouths. The victim's father recalled thinking that "somebody's on drugs, 'cause they're acting crazy." He said the woman remained with his group for a short period of time and walked away without him asking her to do so.

The victim's group decided to throw darts and began gathering change. While the victim's mother was standing near the end of the pool tables and the dartboard room, Defendant approached her, began rubbing the arm of the victim's mother, and asked whether she had been offended by Defendant's friend. The victim's mother replied that everything was fine, that she should "let it go," and that it was not a "big deal." Defendant continued rubbing the arm of the victim's mother, while asking, "Well, are you sure she didn't offend you?" The victim's mother testified that although she was not "comfortable" with the exchange, she attempted to remain cordial and told Defendant, "Everything's fine."

The victim's father testified that although Defendant acted as if she was apologizing to the victim's mother, Defendant continued rubbing the arm of the victim's mother. The victim's father stated that he asked Defendant to return to her group and leave them alone to allow them to enjoy Father's Day but that Defendant refused to leave. The victim's mother said she knew there was going to be an argument, so she walked away. The victim's father raised his voice and pointed to Defendant's group, telling her to return to her friends and to leave his group alone. Mr. Nabors was gathering change and heard the victim's father say, "Get away." Mr. Nabors turned around and saw that Defendant and the victim's father were "face to face."

The victim's father testified that the victim came across his shoulder and hit Defendant twice on the side of her head. Both of the victim's parents said the victim had always been protective of his mother. Mr. Nabors and the victim's father separated the victim and Defendant, during which Defendant's shirt was pulled up and Ms. Hutson saw Defendant's abdomen and a portion of her upper torso and "breast area." Ms. Hutson said the victim's father was smiling as he was pulling Defendant off the victim and described the altercation as "a stupid fight between the two, like a senseless fight." While Mr. Nabors held down the victim, the victim's father put his arms around Defendant and lifted her off the ground.

Ms. Powell heard the commotion and ran back to the pool table area where she saw the victim on the ground and the victim's father holding Defendant. Defendant was saying, "Let go of me. I'm good." Ms. Powell ordered everyone involved to leave the bar. The victim's father acknowledged that an employee of the bar had to tell him multiple times to release Defendant before he did so. He explained that he wanted to ensure that the situation was diffused before releasing her. The victim's parents, Mr. Nabors, Ms. Hutson, and Ms.

Powell each testified that they believed the fight was over. The victim's mother began gathering her things in order to leave, and Mr. Nabors sat down with her.

The victim's father testified that the victim stood up and walked around the pool table and toward the front of the bar. The victim's father said that when he released Defendant, she ran around the end of the pool table, picked up a pool ball, and "sprinted" toward the victim. The victim's father stated that Defendant "didn't waste no time getting to [the victim]." After Defendant reached the victim, the victim's father saw blood coming down the victim's shoulder but did not believe it was serious. The victim's father followed Defendant out the front door, but she reentered the bar and threw the pool ball. The victim's father stated that he did not know whether Defendant was throwing the ball at him or the victim but that they both ducked. The victim's father testified that Defendant was holding a knife in her hand and stated, "[I]f you step outside, I'm going to cut you up too." The prosecutor asked the victim's father whether any of Defendant's actions led him to believe that she was in fear, and the victim's father replied, "No, sir."

The victim's father testified that he learned that the victim was badly injured and returned to tend to him. The victim was lying on the floor while others attempted to render aid. When the victim attempted to breathe, "a big gush of blood" came "just gushing out." The victim's father stated, "[T]here was a huge puddle of blood. It was the most gruesome thing I've ever seen. It was gut-wrenching for a father on Father's Day." Emergency personnel transported the victim to the hospital where he was pronounced dead.

Surveillance video of the events recorded by multiple cameras at different angles inside Bull Feathers was admitted into evidence. The recordings show that at 19:29:52, Defendant was speaking to the victim's mother and Mr. Nabors when Mr. Nabors walked away. Around 19:30:04, the victim's father approached and spoke to Defendant, who was rubbing the arm and shoulder of the victim's mother. At approximately 19:30:26, the victim's mother walked away as Defendant and the victim's father appeared to argue. Mr. Nabors approached them and began speaking to them while the victim approached Defendant from her right side. At approximately 19:30:38, the victim punched Defendant twice on the side of her head, and they both fell on the floor and began fighting while Defendant was on top of the victim. At approximately 19:30:47, the victim's father and Mr. Nabors began pulling Defendant and the victim away from each other. The victim's father pulled Defendant off of the victim and held her while Mr. Nabors held the victim down on the floor. Several people gathered, and Ms. Powell spoke to the group.

At approximately 19:31:14, the victim got up off the floor and walked away from the pool tables toward the front of the bar and stood in an area between the pool tables and the L-shaped bar while looking back toward the pool tables. After the victim walked away from the pool tables, his father released Defendant. At approximately 19:31:32, Defendant

- 4 -

walked away from the group and around a pool table. Approximately six seconds later, Defendant reached for something on the pool table and walked in the same direction in which the victim had walked. Two to three seconds later, Defendant quickly approached the victim and struck the victim in his neck while the victim's arms were down at his sides. Defendant then hopped or skipped backward toward the front door while facing the victim, and Defendant appeared to taunt the victim as the victim slowly walked toward her. At approximately 19:31:49, Defendant exited through the front exit, reentered the bar, took several steps inside the bar, threw an object, and fled. The remainder of the recordings show people gathering around the victim and attempting to render aid as he was lying on the floor and emergency personnel and police arriving.

The victim's mother testified that she did not see the stabbing but that Mr. Nabors told her that the victim had been stabbed. She walked over to the victim and saw people standing around him while others brought towels for the bleeding. She went outside where she saw Defendant hanging out of the passenger side window of a vehicle that was leaving the parking lot. The victim's mother stated that Defendant "had her hat in her hand, swinging it around, yelling like she's done something so grand when she'd just killed my son." The prosecutor asked the victim's mother whether Defendant's actions led her believe that Defendant was in fear, and the victim's mother replied, "No, not at all. No. She acted happy about it[] like it was something good that she had done."

Mr. Nabors testified that after the altercation, he sat down with the victim's mother and did not see where the victim went. Mr. Nabors heard screaming from the front of the bar and walked to the area where he saw the victim fall to the floor. Mr. Nabors saw that the victim's shirt was wet and initially believed someone had thrown water on the victim. Mr. Nabors then realized that the liquid was blood and said, "I've never seen so much blood come out of a body in my life." Mr. Nabors did not see Defendant again and explained that he was focused on the victim.

Ms. Powell testified that after she told those involved in the fight to leave, the victim got up off the floor and walked toward the front exit. The victim stopped before he reached the bar and turned around. Ms. Powell stated that Defendant ran up to the victim and that it appeared that Defendant punched the victim in his neck. Ms. Powell did not see a weapon and did not recall the victim raising his hands or otherwise being in a defensive position. Defendant was backing up and running out through the front exit while laughing and yelling, "I got you. Ha-ha. I got you. I'll get you and you." Ms. Powell said Defendant "was calling out people or the room as a whole." The victim had not yet realized that he was bleeding and walked toward the front exit before collapsing.

Ms. Powell called 911, and the recording of the call was entered as an exhibit at trial. During the call, Ms. Powell reported that "[s]ome girl just stabbed a guy in the

throat," that the man was "pouring blood," and that she believed the man was going to die. Ms. Powell described the assailant and said the assailant was standing outside. She reported that the assailant was "still fighting" and subsequently reported that the assailant had left. Ms. Powell testified that while she was talking to the 911 operator, there was a commotion at the front exit where Defendant was "trying to run back in and out" and was yelling at people. Once the crowd gathered at the front exit, Defendant exited the bar, and Ms. Powell did not see her again.

Ms. Hutson testified that after the altercation at the pool tables, the bartender told both parties to leave. Ms. Hutson saw the victim walking away and stated that the victim rolled his eyes in an "I can't believe that I'm involved in this nonsense, kind of manner." Ms. Hutson agreed that the fight was over and that the victim was leaving toward the best way for him to exit. Ms. Hutson stated that she looked back at Defendant and saw her pick up an object and then "take off" after the victim. Ms. Hutson testified that she followed Defendant,

> [b]ecause I saw a look in her face, and I knew what she was gonna do. I've realized that there's only one reason she's gonna go after him, and he's by himself walking away, and here she comes after him. So I knew there was nothing—she was—she still looked very angry in her face. There was nothing welcoming or nice about it. She was gonna do something.

Once Ms. Hutson caught up to Defendant and the victim, she heard a loud "pop" and saw liquid splash on the seats, her arm, and her shirt. She initially believed Defendant had thrown a drink at the victim, but Ms. Hutson later realized that the liquid was blood. Ms. Hutson put her arm in front of the victim in an effort to calm him and indicate to him that she would not allow the situation to further escalate. Ms. Hutson testified that Defendant had "a look on her face" and said, "Yeah, b***h. What now?" Defendant was screaming and using profanity. Ms. Hutson saw Defendant holding an object that Ms. Hutson later learned was a pool ball, but she did not see Defendant throw the pool ball. Ms. Hutson looked back at the victim and saw him hold his neck, lose consciousness, and fall to the floor. Others began assisting the victim and calling 911, so Ms. Hutson went outside.

Ms. Hutson testified that she saw Defendant standing in the parking lot approximately twenty feet away from the front door of the bar, holding a bloody knife, and screaming something similar to "Yeah, yeah. That's what you get." Ms. Hutson asked Defendant what happened, and Defendant responded, "They ganged me." When Ms. Hutson asked her what she meant, Defendant stated, "The daddy…was holding me back. Did you see it?" Ms. Hutson told Defendant that she had seen what had occurred, and

Defendant asked Ms. Hutson why she did not help her. Ms. Hutson told her that when she looked up, she saw that Defendant and the victim were being separated.

Defendant instructed Ms. Hutson to get her "out of here." Ms. Hutson testified that she felt pressured to help Defendant due to their friendship and her fear of Defendant. Ms. Hutson drove away while Defendant hung outside the car and yelled "[s]ome profanity, some slurs. Like—like, 'Yeah. That's what you b****es get.' Stuff like that." Defendant told Ms. Hutson, "If the daddy hates n*****s, he's really gonna hate n*****s now." Defendant instructed Ms. Hutson to lie and claim that Defendant used a piece of glass rather than a knife to cut the victim. Ms. Hutson responded that Defendant needed to tell the truth and that officers would be able to determine that Defendant used a knife blade and not a piece of glass because the knife blade was serrated.

Ms. Hutson told Defendant that if she believed she acted in self-defense, she needed to inform the police. Ms. Hutson asked Defendant whether she believed the incident involved "some kind of racial thing" toward her, and Defendant replied, "Yeah." Ms. Hutson testified that she never heard anyone make a racial slur during the incident. She asked Defendant what she said to the victim's group, and Defendant maintained that she did not say anything to them. The following exchange then occurred:

Q. And the—because the court reporter—the faces you made when—when she says, "yeah," and did you believe that that's what happened?
A. No.
Q. Why not?
A. It just didn't seem—I wasn't convinced enough by her answer.
Q. Okay. So you're judging that she's again lying to you?
A. Right.

Ms. Hutson testified that Defendant told her that if officers asked her why they left the scene, Ms. Hutson should say that the victim's father told Defendant that he was going to get his gun and shoot her. Ms. Hutson never heard anyone yell, "Get the gun." She asked Defendant whether the victim's father actually made such a statement, and Defendant confirmed that he had not. Ms. Hutson told Defendant that she planned to tell police officers what she actually saw occur. The prosecutor asked Ms. Hutson whether she believed "any of these different versions of the story that [Defendant] was telling you," and Ms. Hutson replied, "No."

Ms. Hutson drove to the apartment complex where she lived and washed blood off of her using a water hose in the parking lot. She saw Defendant holding her bloody knife. Ms. Hutson testified that two men approached them and noticed blood on her and Defendant and that she and Defendant explained that the blood came from "[j]ust a little

bar fight, nothing—nothing major." Defendant continued talking to the two men and compared her knife with the knives of the two men. Defendant subsequently threw her knife into a dumpster located in the parking lot of an apartment complex.

Ms. Hutson testified that she drove Defendant to Sevierville in order to "get some clarity," "get away for a little while," and "[g]et our conscience in check." Ms. Hutson explained that she also was afraid of Defendant and wanted to appease her. She described Defendant as "[v]ery defensive" and said Defendant acted as if she did not harm anyone and did not want to be punished. After dropping Defendant off at a home, Ms. Hutson returned to her apartment where she was met by detectives.

On cross-examination, Ms. Hutson testified that she did not believe she told the detectives about Defendant's urging her to tell officers that Defendant used a piece of glass instead of a knife and that the victim's father made a comment about a gun. Ms. Hutson agreed that Defendant was walking, rather than running, toward the victim before stabbing him. Ms. Hutson stated that Defendant "looked angry" when she was leaving, and Ms. Hutson "knew to go after her." Ms. Hutson agreed that Defendant was angry, believed she had been unjustifiably attacked, and was acting as if she did nothing wrong because she was just defending herself. Ms. Hutson also agreed that Defendant said she planned to turn herself in to the police the following morning.

Freddie James Galbreath testified that he arrived at Bull Feathers and was walking toward the restrooms when he saw a fight occurring near the pool tables. He stopped and stood between a DJ booth and a "split" near the pool tables that led to the restrooms. Mr. Galbreath stated that the fight already had been broken up and that employees from the bar were ordering those involved to leave. He saw the victim walking away from the area and toward the front door. Mr. Galbreath said Defendant got up, and "pretty much ran" to the area where Mr. Galbreath was standing and toward the victim. Mr. Galbreath stated that it appeared that Defendant jumped up and hit the victim in the back of his head. Defendant subsequently threw a pool ball, and Mr. Galbreath heard her say, "What now? Come on, m*********er. What? What now?" He believed Defendant ran out of the bar but stated that he was focused on the victim. When asked to describe Defendant's demeanor before she stabbed the victim, Mr. Galbreath replied, "Angry, aggressive." The prosecutor also asked him whether Defendant looked afraid, and Mr. Galbreath stated, "No."

Mr. Galbreath observed what appeared to be a long cord coming from the victim's neck. When he approached the victim, he saw that the cord was actually blood. Mr. Galbreath, who had medical training as a member of the Tennessee Army National Guard, obtained a first aid kit from the bar area. The first aid kit did not contain any compressed gauze, so Mr. Galbreath and a woman, who was a nurse, had to use towels to apply pressure to the victim's wound. They were able to move the victim to his side to slow some of the

blood coming from his neck, but blood also was coming from his mouth. Mr. Galbreath used towels to scoop blood out of the victim's mouth to allow him to breathe. The victim was unable to speak, but Mr. Galbreath spoke to him while rendering aid in an effort to calm the victim and ensure that the victim did not feel alone. The victim's clothes and the floor around the victim were covered in blood. Mr. Galbreath could tell that "the life was leaving [the victim's] body" in that "his breathing got shallower and shallower" and "[h]is movement came less and less." Mr. Galbreath remained with the victim until the paramedics arrived.

Jason Blair was with Jasmine Blair and his best friend at Bull Feathers when he heard a commotion near the pool tables. He testified that when he looked back, he saw a fight that "didn't really seem like a big deal." He stated, "They got it separated, and the female was about to head back out, 'cause they told everybody to leave, and she turned back around, and they reengaged a scuffle there, and then that's where the gentleman was stabbed in the neck." Mr. Blair heard screaming and yelling and stated that he overheard Defendant say something along the lines of "So I'm good enough to talk to, but not good enough to date." Mr. Blair testified that Defendant continued screaming and yelling as one of her friends was pulling her out of the bar. He believed Defendant was attempting to reenter the bar. The prosecutor asked Mr. Blair whether any of Defendant's actions led him to believe that she was afraid, and Mr. Blair responded, "It just looked like anger to me."

Jasmine Blair, Mr. Blair's wife, testified that after she heard a commotion, she saw a woman and a man fighting on the floor. The man and the woman were told to leave the bar as a result of the fight. Mrs. Blair stated that after the man and the woman walked around the corner of the bar, the man stood with his arms to his side as the woman's friend pulled the woman out of the restaurant while saying, "Let's go. Let's go." Mrs. Blair said that after the woman exited the bar, she reentered the bar and punched the man in his neck, and the man collapsed a few minutes later. At one point, Mrs. Blair overheard the woman make a statement similar to "I'm not good enough to flirt with so I can't be dated." While in the parking lot, the woman's friend tried to get her inside a vehicle, but the woman did not want to do so and tried to see what was occurring inside the bar. The prosecutor asked Mrs. Blair whether "anything about how she was acting and seemingly struggling with her friend" led Mrs. Blair to believe that the woman was afraid, and Mrs. Blair replied, "No. Huh-uh."

Devan Hornback, an automobile technician, testified that on the evening of June 17, 2018, he was installing a radiator in his roommate's car in the parking lot of an apartment complex when he spilled fluid on his hands. He walked over to a water hose to wash his hands and saw a Caucasian woman and an African-American woman, both of whom had blood on them. The African-American woman said that a man caused trouble with her and

her friends and that she had to defend herself. She demonstrated the actions that she had taken against the man, and Mr. Hornback stated that the woman said she used either a shard of glass or a knife. After Mr. Hornback and his roommate ensured that the women were uninjured, the women drove away. On cross-examination, Mr. Hornback agreed that Defendant stated that a man did not need to put his hands on a woman, that she was defending herself, and that she was scared for her life.

Detective Jeremy McCord of the Knox County Sheriff's Office (KCSO) was the lead detective in the case. Detective McCord testified that patrol units had responded by the time that he arrived at the scene and that the victim had been transported to the hospital where he had been pronounced deceased. Detective McCord entered the bar and saw a large amount of blood on the floor where the victim had been lying and drops of blood on the floor in areas where the victim had walked after he had been stabbed but before he collapsed. Detective McCord stated that there were no barriers or impediments that had to be moved before he could walk around the bar and that none of the exits were blocked.

Detective McCord and other detectives interviewed witnesses and obtained the identification of those involved in the incident and a description of the vehicle in which they fled. Patrol units went to the area where Ms. Hutson, the driver of the vehicle, lived. Officers were flagged down and were told about some women, who had cleaned blood off themselves and had thrown a knife in a dumpster before leaving. Lieutenant Steven Sanders was assigned to collect evidence from the dumpster.

Detective McCord and other officers went to Ms. Hutson's apartment and spoke to her mother, who stated that Ms. Hutson was on her way home. When Ms. Hutson arrived, Detective McCord interviewed her and learned that she had dropped Defendant off at a location in South Knoxville. Lieutenant Sanders and other detectives went to the location while Detective McCord continued interviewing Ms. Hutson. The prosecutor asked, "Does there come a time where you got word from Lieutenant Sanders about what has transpired?" Detective McCord testified, "Yes. He had indicated that they were able to get her in custody, and she did not want to make a statement." The prosecutor then asked what was the next step in the investigation, and Detective McCord responded that he consulted with the District Attorney General's Office, that Defendant was placed into custody, and that warrants were placed on file.

On cross-examination, Detective McCord testified that Ms. Hutson did not inform him that Defendant had asked her to tell officers that Defendant cut the victim with a piece of glass or that the victim's father had a gun. On redirect examination, Detective McCord testified that when he interviewed Ms. Hutson, he asked her about what had occurred and that he was focused on apprehending Defendant.

- 10 -

KCSO Lieutenant Steven Sanders testified that he searched the dumpster in the apartment complex and located a knife inside the back corner of the dumpster. He stated that Ms. Hutson had provided a description of the knife and the dumpster in which the knife was located. He said both the dumpster that he searched and the knife that he found matched the descriptions provided by Ms. Hutson.

Lieutenant Sanders and other officers went to a house in South Knoxville where they had learned that Defendant was located. The owner allowed the officers to enter and told them that Defendant was upstairs. The officers made several announcements, but Defendant did not respond. Lieutenant Sanders testified that "once we actually started to go in the house engaged, [Defendant] actually came down the stairwell, and still was kind of refusing, as far as cooperation."

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties, performed the victim's autopsy. She concluded that the cause of the victim's death was exsanguination of blood from a stab wound to his neck and that the manner of death was homicide.

Dr. Mileusnic-Polchan testified that the victim sustained a stab wound to the left side of his neck located about seven and one-half inches from the top of his head and five and one-half inches to the side, which meant that "it was like a really sideways position." The stab wound was level with the victim's ear lobe. The lower portion of the stab wound had sharp edges that were about one-inch long and downward oriented, which occurred when the very sharp blade created a "slash" in the skin. Dr. Mileusnic-Polchan stated that the "slash" wound and a puncture located behind the victim's ear could reflect that the victim's head moved when the knife blade was either entering or exiting his neck.

Dr. Mileusnic-Polchan testified that the upper part of the stab wound was "blunted" and had "almost like a squared-off scratch on top" that continued along the interior margin. She stated that this "blunted area" indicated that the hilt of the knife "came all the way to the skin and made contact and abraded the skin from the impact as it's thrusted." She believed the impact created by the hilt indicated that the entire blade of the knife was thrust into the victim's neck. She estimated that the depth of the wound was about three inches. She examined the knife recovered from the dumpster and testified that the depth of the wound was consistent with having been made by the knife.

Dr. Mileusnic-Polchan testified that the knife entered the victim's neck from left to right, almost directly horizontally, and back to front. She stated that the wound was irregular and that the irregularity was created by the rotation of the blade as it was removed from the victim's neck.

Dr. Mileusnic-Polchan testified that the blade penetrated the primary thick muscle and the carotid artery, the primary artery in the neck that supplies blood to the brain. She explained that the carotid artery was perforated and not severed because the knife blade made a vertical, rather than a horizontal, cut of the artery and created a vertical slit all the way through the front and back of the artery. The cut created an "arterial gush" or a systematic high pressure flow, which was what witnesses described as appearing like a cord hanging from the victim's neck. The knife blade also penetrated through the back of the pharynx, the area of the throat dividing the airway and the digestive system, which contributed to exsanguination or bleeding out and caused the victim to aspirate blood. The tip of the knife blade came near the victim's spine but did not penetrate it.

Dr. Mileusnic-Polchan testified that blood loss from such an injury would have occurred quickly and that due to the location of the injury, preventing the bleeding would have been difficult even with compression applied. The blood loss would have caused the left side of the brain to be completely deprived of the main blood supply. Dr. Mileusnic-Polchan stated that as a result, the victim could have collapsed within fifteen to thirty seconds of the compromised circulation. She explained that when the carotid artery is severed, loss of consciousness generally occurs within fifteen seconds, and death occurs shortly thereafter. She stated that because the victim's carotid artery was slit vertically and pressure was applied, it could have taken one minute but not more than a few minutes before the victim died.

Dr. Mileusnic-Polchan observed what appeared to be scratches from fingernails on the victim's neck, face, and arms. She did not observe any defensive wounds on his hands. On cross-examination, she testified that according to the toxicology report, the victim had a blood alcohol level of 0.19, which was more than twice the legal limit.

The defense presented the testimony of Timothy Paynter, who was with Defendant at Bull Feathers. Mr. Paynter testified that prior to going to Bull Feathers, they were at another bar and that he was unaware of Defendant's drinking any alcohol while at that bar. He stated that while at Bull Feathers, he did not pay attention to what was occurring in the back corner near the pool tables prior to the fight between Defendant and the victim. He stated that he looked up when he heard someone say, "stupid n****r." He then went to the area to attempt to break up the fight. He said he told the man who was holding Defendant to release her because he was afraid that the man was crushing her.

Mr. Paynter testified that he was not paying attention when Defendant walked away from the area and that he was searching for items that may have fallen out of Defendant's pockets. He stated that he heard someone say, "Get her," but he did not know who said it. Mr. Paynter said he "assume[d] the dad" made the statement but acknowledged that he did not actually see the victim's father make the statement. Mr. Paynter also did not see the

stabbing. He stated that Defendant had left when he started walking toward the door and that when he walked past the victim, he saw that the victim was bleeding. Mr. Paynter said that when he went outside, he saw Defendant, who was scared and trembling, and that he told Defendant that she needed to leave. Defendant then left.

On cross-examination, Mr. Paynter testified that he did not see Defendant render aid to the victim and that he was not aware of whether she called 911. He stated that when Defendant was driving away from the scene, she was hanging out of the window, that her hat fell off, and that he picked up the hat for her. He acknowledged that he told police officers that Defendant's name was "Scarlee," and he explained that he did not tell the officers Defendant's actual name because he was afraid. He also did not tell the police officers that someone made a racial slur, that someone had stated "Get her," or that Defendant was scared and trembling. He maintained that Defendant did not tell him to offer such testimony, and he was unaware that Defendant had attempted to instruct Ms. Hutson on what to tell the police.

At the close of the proof, the jury convicted Defendant of second degree murder and tampering with evidence as charged in the indictment.

### Sentencing Hearing

Prior to the sentencing hearing, Defendant filed a sentencing memorandum, attaching letters written by various people on her behalf. The State presented victim impact testimony from the victim's sister, girlfriend, aunt, and father. They each testified regarding the void created by the victim's death, as well as the fact that the victim's daughter will grow up without him. They each asked the trial court to impose the maximum sentence. Defendant made an allocution during which she apologized for her actions.

The State entered as an exhibit a certified copy of a judgment showing that Defendant was convicted of attempted possession of marijuana, a Class B misdemeanor, in April 2010. The State also entered as exhibits certified copies of two orders of protection entered against Defendant by two different people, one in 2010 and the second in 2016. The 2010 order of protection was issued after Defendant punched, slapped, choked, and bit the petitioner during an argument. The court issued the order of protection following a hearing during which the court found that Defendant committed the acts alleged in the petition. The 2016 order of protection was an agreed order, and the trial court concluded that it could not consider this order of protection in sentencing Defendant because there were no findings of fact by the court that issued the order of protection.

The trial court found that Defendant was a Range I, standard offender. The court applied enhancement factor (1), Defendant had a "previous history of criminal convictions

or criminal behavior, in addition to those necessary to establish the appropriate range," based upon Defendant's prior misdemeanor conviction and the 2010 order of protection. *See* Tenn. Code Ann. § 40-35-114(1). The court noted that while the length of Defendant's criminal history was not "terribly disturbing," the 2010 order of protection carried more weight. The court also applied enhancement factor (3), the offense involved more than one victim, based on evidence that Defendant threatened and threw a pool ball at others, including the victim's father, after stabbing the victim. *See* Tenn. Code Ann. § 40-35-114(3). The court found that the enhancement factor was not entitled to a great deal of weight. The court applied enhancement factor (9), Defendant possessed or employed a deadly weapon during the commission of the offense, noting that the use of a deadly weapon is not an element of second degree murder. *See* Tenn. Code Ann. § 40-35-114(9). The court placed "significant consideration" on the enhancement factor, finding that Defendant escalated what began as a fistfight by later producing the knife. The court declined to apply enhancement factor (10), Defendant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10).

The trial court applied mitigating factor (2), Defendant "acted under strong provocation." Tenn. Code Ann. § 40-35-113(2). The court expressed its belief that had Defendant asked the bartender to call the police after the initial fight, the victim would have been arrested and convicted of assault. The court, however, found that after "a clear break in the altercation," Defendant "made a separate decision" in attacking the victim and that "because of the facts that occurred after the break," the mitigating evidence was outweighed "by the facts of the case and the enhancement factors."

In examining the facts of the case, the trial court stated that the victim's attacking Defendant "was the beginning of the violence" and that the victim had no right to strike Defendant regardless of "[w]hatever [Defendant] was doing in an annoying intoxicated fashion." The court stated that the victim and Defendant were quickly separated, that "there was a clear break in the violence," and that the victim walked away. The court noted the defense's argument that the initial fight lasted for about forty-five seconds and that only fifteen seconds elapsed before Defendant stabbed the victim. However, the court found that it was not the length of time but the "behavior of the individuals after the breakup" that was significant. The court noted that the video clearly established that the victim and others in the area believed the violent confrontation had ended. The court found that before Defendant saw the victim when she came around the bar, she pulled out her knife and that had Defendant been afraid of the victim, she would not have walked in the same area where the victim walked but would have exited another way. The court stated that Defendant "was coming to exact her revenge" on the victim and that she was "very deceptive in her actions." The court noted that Defendant kept her hands down by her side, that the victim "never saw it coming," that the victim did not act threatening toward Defendant, that Defendant "just very quickly struck out before [the victim] could even get his hands up,"

and that Defendant "went straight for his neck." The court found that the evidence demonstrated that Defendant "went beyond" a knowing killing and that she "intentionally acted to stab [the victim] in the throat in an effort to take his life." The court determined that the facts of the case were "so egregious" that "the enhancement factors and the mitigations sort of pale in comparison to the underlying facts" and that the maximum sentence for second degree murder was warranted. The court stated that Defendant did not act afraid and did not panic after the stabbing but was "celebrating what she's just accomplished" by laughing, mocking, challenging others, and hanging out of the car window "to give her last retorts" as her friend drove her away from the scene.

The trial court stated that the facts supporting the tampering with evidence conviction were "not as egregious" and that while Defendant clearly disposed of the knife in an effort to avoid punishment, "[t]hat's what tampering with evidence is." The court observed that by disposing of the knife, Defendant was not accepting responsibility and was trying to minimize the impact to her. However, the court determined that the application of the enhancement factors were not sufficient to enhance the sentence for the tampering conviction above the minimum sentence.

The trial court noted that the State sought consecutive sentencing, arguing that Defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). The court found that the circumstances of the case were "aggravated." The court also found that confinement for an extended period of time was necessary to protect society from Defendant's further criminal conduct. The court noted that Defendant's prior violent behavior resulted in an order of protection in 2010 and her behavior after the stabbing "indicates that violent behavior is not something that bothers her too much." The court found that by ordering that the minimum sentence for the tampering conviction run consecutively to the sentence for the second degree murder conviction, the aggregate length of the sentence would be reasonably related to the offenses of which Defendant stood convicted. The trial court imposed a twenty-five-year sentence for the second degree murder conviction and a three-year sentence for the tampering with evidence conviction and ordered that the sentences run consecutively for an effective sentence of twenty-eight years.

Defendant filed a motion for new trial and an amended motion, raising numerous issues. The trial court denied the motion, and Defendant appealed.

## II. Analysis

On appeal, Defendant contends that (1) the evidence is insufficient to support her conviction for second degree murder; (2) the State improperly introduced speculative and

improper opinion testimony from fact witnesses; (3) the trial court erred in admitting evidence that Defendant declined to make a statement following her arrest; (4) the trial court issued multiple erroneous jury instructions; (5) the State made improper comments during closing arguments; (6) the trial court imposed an excessive sentence; and (7) the cumulative effect of the errors warrants relief.

## A. Sufficiency

Defendant challenges the sufficiency of the evidence supporting her conviction for second degree murder, arguing that the proof more accurately supports a conviction for the lesser charge of voluntary manslaughter. The State responds that the evidence does not support Defendant's claim that she acted in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Second degree murder is defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a "result-of-conduct" offense, which means that the statute focuses upon "the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000); *see State v. Brown*,

311 S.W.3d 422, 431-32 (Tenn. 2010). Thus, a person acts "knowingly" as it pertains to second degree murder "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). The issue of whether a defendant acted knowingly is a question of fact for the jury. *See State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000).

The evidence presented at trial established that Defendant approached the victim's mother at the bar and began rubbing her arm while talking to her. Defendant made the victim's mother uncomfortable and refused to leave when the victim's father asked her to do so. Defendant and the victim's father argued until the victim struck Defendant twice on the side of her head with his fists. Defendant and the victim began fighting on the floor while Defendant was on top of the victim. Mr. Nabors and the victim's father separated Defendant and the victim within seconds after the fight began. The victim got up off the floor and walked away from the area of the fight and toward the front of the bar. The victim's father continued to hold Defendant back to ensure that the situation had diffused, and Defendant told him to let her go and ensured him that she was "good." Those who witnessed the fight testified that they believed the fight was over.

Once the victim's father released Defendant, Defendant grabbed a pool ball, quickly approached the victim, and buried the entire blade of a three-inch knife into the victim's neck. As evidenced by the irregular shape of the wound, the blade rotated as Defendant removed it from the victim's neck. Defendant then taunted the victim while she hopped or skipped toward the front door. Ms. Hutson testified that Defendant said, "Yeah, b***h. What now?" After exiting the bar, Defendant reentered and threw a pool ball toward the victim and his father. Mr. Galbreath heard Defendant say, "What now? Come on, m*********er. What? What now?" Defendant was holding her knife and threatened to cut the victim's father. As Ms. Hutson drove Defendant away from the scene, Defendant hung outside the passenger window and waived her hat around while yelling, "Yeah. That's what you b****es get." Defendant attempted to persuade Ms. Hutson to lie to the police about what occurred. Later in the parking lot of the apartment complex where Ms. Hutson lived, Defendant demonstrated her actions to Mr. Hornback and his friend and discarded the knife in a dumpster.

Defendant maintains that the victim's actions in striking her and his father's actions in holding her following the fight constituted adequate provocation as to warrant a conviction for the lesser included offense of voluntary manslaughter. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. *See State v. Williams*, 38 S.W.3d 532, 539 (Tenn. 2001) ("[W]hether a knowing killing

resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question."); *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."). The jury rejected any claim that Defendant acted with adequate provocation, which was its province. *See Williams*, 38 S.W.3d at 539. Therefore, viewing the evidence in the light most favorable to the State, we conclude that the evidence presented at trial is sufficient to support Defendant's conviction for second degree murder.

## B. Admission of Lay Opinion Testimony

Defendant challenges the admission of testimony of multiple witnesses as improperly lay opinion testimony under Tennessee Rule of Evidence 701, as irrelevant under Rule 401, and as unfairly prejudicial under Rule 403. She asserts that the trial court improperly admitted (1) the testimony of the victim's mother that she did not believe Defendant was afraid based upon her actions and that Defendant "acted happy about it, like it was something good that she had done"; (2) Mr. Galbreath's testimony that Defendant did not look afraid prior to the stabbing; (3) Mr. Blair's testimony that "It just looked like anger to me" when asked whether he believed Defendant was afraid based on her actions; (4) Mrs. Blair's testimony that she did not believe the woman who committed the stabbing was afraid based on her actions; (5) Ms. Hutson's testimony that she did not believe Defendant's version of the events; and (6) Ms. Hutson's testimony that after seeing Defendant pick up an object and "take off" after the victim, Ms. Hutson followed Defendant

> [b]ecause I saw a look in her face, and I knew what she was gonna do. I've realized that there's only one reason she's gonna go after him, and he's by himself walking away, and here she comes after him. So I knew there was nothing—she was—she still looked very angry in her face. There was nothing welcoming or nice about it. She was gonna do something.

Defendant acknowledges that she did not object to any of this testimony at trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (holding that when a defendant fails to object to the admissibility of evidence, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible'") (quoting *State v. Harrington*, 627

S.W.2d 345, 348 (Tenn. 1981)). Defendant, however, asserts that the admission of the evidence rose to the level of plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before this court will recognize plain error, and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504-05 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id*. at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016)).

In order for evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, if "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…." Tenn. R. Evid. 403.

A lay witness may give testimony in the form of an opinion or inference if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Lay opinion testimony should be based on admissible facts that are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). To be admissible, a lay opinion should be within the range of knowledge or understanding of ordinary laymen. *Id.* A witness's lay opinion is admissible when the jury could not readily draw its own conclusions on the issue without the witness's lay opinion or where the witness cannot effectively testify without stating the inference or opinion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). "If an opinion is based upon a lay witness's own

observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible." *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992) (citation omitted).

Although Defendant challenges the admission of testimony from multiple witnesses that she appeared angry rather than afraid prior to and after she stabbed the victim, this court has held that testimony regarding a defendant's demeanor was proper lay opinion testimony under Rule 701. *See e.g., State v. Shawnda James*, No. 01C01-9803-CC-00093, 1999 WL 618886, at *8 (Tenn. Crim. App. Aug. 11, 1999) (holding that even if testimony regarding the defendant's post-crime demeanor constituted an opinion, such testimony was properly admitted pursuant to Rule 701); *State v. Shawn D. Lesley*, No. 01C01-9702-CR-00068, 1999 WL 233636, at *3 (Tenn. Crim. App. Apr. 20, 1999) (concluding that a witness's use of the word "calmly" to describe the defendant's demeanor satisfied the requirements of both the prior and amended versions of Rule 701); *see also* Cohen, Sheppeard & Paine, *Tennessee Law of Evidence* § 7.01[4][c] (6th ed. 2011) ("The types of general opinion testimony that might, if relevant, be helpful and admissible under Rule 701 include that an individual is … 'angry, frightened, upset, aroused, or shocked'…."). The witnesses' testimony regarding Defendant's demeanor was rationally based on the witnesses' perceptions and was helpful to the jury on the issue of Defendant's mental state. Thus, the witnesses' testimony was relevant. *See State v. Davidson*, 121 S.W.3d 600, 617 (Tenn. 2003) (recognizing that the concept of relevance is implicit in the requirement that the lay opinion be helpful). Defendant failed to establish that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. The admission of the evidence did not breach a clear and unequivocal rule of law and, therefore, did not rise to the level of plain error. *See Smith*, 24 S.W.3d at 282.

Defendant also challenges Ms. Hutson's testimony that she did not believe Defendant's statements to her about the stabbing and Ms. Hutson's testimony that upon seeing Defendant pick up an object and "take off" after the victim, Ms. Hutson followed Defendant because she knew what the Defendant was going to do. However, Defendant fails to establish plain error. We have recognized that "'rarely will plain error review extend to an evidentiary issue.'" *State v. Jonathan Mitchell Grimes*, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)). With regard to Ms. Hutson's testimony that she did not believe Defendant's statements, we note that Defendant's claims to Ms. Hutson about what had occurred also were inconsistent with the proof presented at trial. Furthermore, any

error in the admission of Ms. Hutson's testimony that she knew what Defendant was going to do was harmless in light of the overwhelming evidence of Defendant's guilt. We conclude that Defendant has failed to establish that a substantial right was adversely affected by the admission of the testimony or that consideration of any error is necessary to do substantial justice. *See Smith*, 24 S.W.3d at 282. Accordingly, Defendant is not entitled to plain error relief.

## C. Admission of Evidence of the Defendant's Declining to Make a Statement

Defendant asserts that the trial court erred in admitting testimony from Detective McCord that Lieutenant Sanders "had indicated that they were able to get [Defendant] in custody, and she did not want to make a statement." Defendant argues that the testimony is inadmissible hearsay and an improper comment on the exercise of her right to remain silent. She acknowledges that she did not object to the testimony at trial but maintains that the admission of the testimony constitutes plain error. *See* Tenn. R. App. P. 36(a); *Smith*, 24 S.W.3d at 280-81. The State responds that Defendant failed to establish plain error. We agree with the State.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court set forth procedural safeguards to protect a defendant's Fifth Amendment rights during custodial interrogation. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (holding that *Miranda* announced a binding "constitutional rule" under the Fifth Amendment). The Supreme Court subsequently held that the Due Process Clause of the Fourteenth Amendment prohibited a defendant's impeachment at trial for exercising his Fifth Amendment right to remain silent after receiving *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976); *see State v. Dotson*, 450 S.W.3d 1, 55 (Tenn. 2014). The Court revisited *Doyle* in *Wainwright v. Greenfield*, 474 U.S. 284, 287 (1986), where the prosecutor was allowed to introduce evidence as part of the case in chief that the defendant, who had pleaded not guilty by reason of insanity, "exercised his right to remain silent and … expressed a desire to consult counsel before answering any questions" and the prosecutor argued during closing arguments that the defendant's "repeated refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension … inconsistent with … insanity." In reversing the defendant's conviction, the Court emphasized that "[t]he point of … *Doyle* … is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter … us[e] the silence to impeach [him]" or otherwise "make use of the … exercise of those rights in obtaining his conviction." *Greenfield*, 474 U.S. at 292. The Court explained that "[w]hat is impermissible is the *evidentiary use* of an individual's exercise of his constitutional rights after the … assurance" of *Miranda*. *Id.* at 295 (emphasis added).

In *Greer v. Miller*, 483 U.S. 756, 759, 764 (1987), the Court addressed the application of *Doyle* to a prosecutor's question to a witness which "touched upon [the defendant's] postarrest silence" after which the trial court sustained the defendant's objection to the question, instructed the jury to "ignore" it, and prohibited additional "questioning or argument with respect to [the defendant's] silence." The Court noted that in cases in which the Court had previously applied *Doyle*, the trial court had allowed specific questions or argument regarding the defendant's post-*Miranda* silence. *Id*. at 764. The Court determined that "no *Doyle* violation occurred" in *Greer* because the defendant's "postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Id.* at 764-65.

In reviewing these cases, the Tennessee Supreme Court recognized that *Doyle* "'does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor.'" *Dotson*, 450 S.W.3d at 56 (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991)). For example, an officer's inadvertent testimony regarding a defendant's request for counsel did not violate *Doyle* when the prosecutor did not use the testimony to impeach the defendant or argue the defendant's guilt to the jury. *Lindgren*, 925 F.2d at 202: *see Dotson*, 450 S.W.3d at 59 (holding that an officer's "isolated references to the defendant's invocation of his right to counsel" did not violate *Doyle* when "the prosecution did not make any evidentiary use of the testimony or attempt to penalize the defendant for exercising his constitutional right").

Likewise, in the present case, Detective McCord briefly commented on Defendant's exercise of her right to remain silent. The prosecutor moved on in questioning Detective McCord about other topics and did not mention Defendant's silence when questioning other witnesses or during closing arguments. The State did not use the testimony to impeach Defendant or argue her guilt to the jury. Defendant has failed to establish a *Doyle* violation and, thus, there was no breach of a clear and unequivocal rule of law so as to warrant a finding of plain error. *See Smith*, 24 S.W.3d at 282.

Defendant also argues that Detective McCord's testimony regarding the information that he learned from Lieutenant Sanders was inadmissible hearsay. The State responds that Defendant failed to cite to any relevant authority or provide any argument "beyond the sole conclusory statement that Detective McCord's statement was hearsay" and that, therefore, Defendant has waived the issue. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We disagree that Defendant's argument in her brief is limited to a "sole conclusory statement." Rather, Defendant cited to the applicable rule and explained why she believed the testimony met the definition of hearsay. Accordingly, Defendant's brief is adequate for this court to address the issue.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible at trial, unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. Detective McCord's testimony repeating information that he learned from Lieutenant Sanders constituted hearsay. However, Defendant has failed to show that consideration of the error is necessary to do substantial justice or that a substantial right was adversely affected in light of the limited nature of the testimony, the prosecutor's decision to avoid mentioning the testimony during closing arguments, and the strong evidence of guilt. *See Smith*, 24 S.W.3d at 282. Thus, Defendant has failed to establish plain error in the admission of the testimony.

### D. Jury Instructions

Defendant asserts that the trial court issued multiple erroneous jury instructions relating to self-defense and voluntary manslaughter. Defendant specifically asserts that the trial court erred by (1) giving the jury the possibility of determining that Defendant had a duty to retreat before engaging in self-defense; (2) instructing the jury that Defendant's provocation could deny her the right to engage in self-defense; (3) incorrectly defining voluntary manslaughter; (4) instructing the jury that to establish voluntary manslaughter, the element of state of passion had to be proven by the State; and (5) instructing the jury that it could not consider voluntary manslaughter unless it first acquitted Defendant on the charge of second degree murder.

"'It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions.'" *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (quoting *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001)). Thus, a trial court has a duty to give "'a complete charge of the law applicable to the facts of a case.'" *Id.* (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). Issues relating to the propriety of jury instructions involve mixed questions of law and fact, which we review de novo with no presumption of correctness. *Id.* (citing *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001)). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" *Id.* (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)).

Defendant did not object to the jury instructions at trial, but she raised the issues in her amended motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for new trial and is not waived by the failure to make a contemporaneous objection." *Faulkner*, 154 S.W.3d

at 58 (citing *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996); Tenn. R. Crim. P. 30(b)). Defendant argues that the jury instructions were erroneous or inaccurate rather than incomplete. Therefore, her failure to object to the jury instructions at trial do not preclude our review of her claims.

## 1. Self-Defense Instruction

At the time of the offense, Tennessee Code Annotated section 39-11-611 provided in pertinent part:

(b)(1)  Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2)  Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A)  The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
(B)  The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C)  The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2017).[2]  The threat or use of force against another, however, is not justified:

If the person using force provoked the other individual's use or attempted use of unlawful force, unless:

(A)  The person using force abandons the encounter or clearly communicates to the other the intent to do so; and

---

[2] We note that the statute has been amended by deleting the language regarding "not engaged in unlawful activity" and substituting "not engaged in conduct that would constitute a felony or Class A misdemeanor."  2021 Tenn. Pub. Laws ch.115, section 3.

(B) The other person nevertheless continues or attempts to use unlawful force against the person[.]

Tenn. Code Ann. 39-11-611(e)(2) (Supp. 2017).

At trial, the trial court instructed the jury in pertinent part as follows:

Included in the defendant's plea of not guilty is her plea of self-defense.

If a defendant was in a place where he or she had a right to be, he or she would have a right to use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use of unlawful force. The defendant would also have no duty to retreat before using force.

If a defendant was in a place where she had a right to be, she would also have a right to use force intended or likely to cause death if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds. The defendant would also have no duty to retreat before using force likely to cause death.

In determining whether the defendant's use of force in defending herself was reasonable, you may consider not only her use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death from the deceased include but are not limited to any previous threats of the deceased made known to the defendant; the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased; and the manner in which the parties were armed and their relative strengths and sizes.

The use of force against the deceased would not have been justified if the defendant provoked the deceased's use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued to use unlawful force against the defendant.

- 25 -

Defendant challenges the portion of the instruction which allows the jury to decide whether she was in a place where she had a right to be. She maintains that the issue of whether she was in a place where she had a right to be was a threshold determination to be made by the trial court in accordance with *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), in examining whether to instruct the jury that a defendant has no duty to retreat. Defendant asserts that by providing this "conditional instruction," the trial court "left the question of whether [Defendant] was under a duty to retreat to be resolved by the jury." The State responds that the trial court gave the pattern jury instruction on self-defense, that the trial court made the threshold determination that Defendant was not engaged in unlawful activity and informed the jury that Defendant had no duty to retreat, and that the issue of whether Defendant was in a place where she was entitled to be is a factual determination to be made by the jury.

Defendant also challenges the portion of the self-defense instruction which stated that her use of force against the victim would not have been justified if Defendant provoked the victim's use of unlawful force. Defendant asserts that her actions did not constitute adequate provocation of the use of unlawful force and that, thus, the issue of provocation was not raised by the evidence so as to warrant the instruction. The State responds that the trial court's decision to instruct the jury regarding how to consider provocation was appropriate based upon the evidence presented at trial and that the instruction fairly submitted the legal issues and did not mislead the jury as to the applicable law.

We need not determine whether the instructions were erroneous, however, because we conclude that any error in instructing the jury regarding self-defense was harmless beyond a reasonable doubt. *See Perrier*, 536 S.W.3d at 404-05 (concluding that the trial court's error in instructing the jury regarding self-defense was harmless beyond a reasonable doubt "because no reasonable jury would have accepted the defendant's self-defense theory"). The State did not argue in its brief that any error was harmless beyond a reasonable doubt, and Defendant asserts in her reply brief that the State waived the argument as a result. We note that Defendant did not cite to any authority to support her waiver argument. Furthermore, during oral argument, the State asserted that any error in the instruction was harmless beyond a reasonable doubt. Thus, we will address the issue.

In order to determine whether an instructional error is harmless, we must ask "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013) (quoting *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)); *see Perrier*, 536 S.W.3d at 404 n.8. According to the evidence presented at trial, which included a video recording of the incident, the fist fight between Defendant and the victim had been broken up prior to the stabbing, and the victim had walked away from the area. Defendant grabbed a pool ball, quickly approached the victim, and stabbed him in the neck. The victim was not

attempting to reengage Defendant when Defendant stabbed him, and the victim had no defensive wounds as Defendant stabbed him before he had the opportunity to fend off her attack. Defendant demonstrated no fear of the victim but taunted and cursed him as she skipped backwards toward the door. She then reentered the bar and threw a pool ball toward the victim and his father while continuing to taunt and curse at them. As Ms. Hutson drove away from the scene, Defendant hung outside of the passenger window while yelling and waving her cap in an apparent celebration of her actions.

We conclude that based upon the evidence presented at trial, "no reasonable jury would have accepted the [D]efendant's self-defense theory." *Perrier*, 536 S.W.3d at 404-05. The evidence does not show that Defendant believed she was in imminent danger of death or serious bodily injury when she stabbed the victim or that any such belief was reasonable. *See* Tenn. Code Ann. § 39-11-611(b) (Supp. 2017). Accordingly, any error in the self-defense instruction was harmless beyond a reasonable doubt.

## 2. Voluntary Manslaughter Instructions

After the trial court instructed the jury regarding the elements of second degree murder, the court instructed the jury that "[t]he distinction between voluntary manslaughter (a lesser included offense) and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner." The court informed the jurors that if they had reasonable doubt as to Defendant's guilt for second degree murder, their verdict must be not guilty as to the offense and that the jurors then shall proceed to determine Defendant's guilt or innocence for voluntary manslaughter, a lesser included offense. The court set forth the elements of voluntary manslaughter, including that "the killing resulted from a state of passion produced by adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner." The court instructed the jury that the State had the burden of proving the elements of voluntary manslaughter beyond a reasonable doubt. After the court informed the jurors of the elements of the charged offenses and each applicable lesser included offense, the court instructed the jurors that they must first consider the offense charged in the indictment and that only if they find Defendant not guilty of the charged offense or have reasonable doubt of Defendant's guilt for the charged offense then the jurors may consider whether Defendant is guilty of the next listed lesser included offense.

Defendant maintains that state of passion due to adequate provocation is a partial defense to second degree murder that the State has the burden to disprove beyond a reasonable doubt to sustain a conviction for second degree murder rather than an element of the offense of voluntary manslaughter. Defendant asserts that the jury instructions are erroneous in that the instructions do not require that state of passion be proven or disproven

to sustain a conviction for second degree murder but, rather, classify state of passion as a "positive element" of voluntary manslaughter, which the State has the burden of proving beyond a reasonable doubt to sustain a conviction for voluntary manslaughter as a lesser included offense of second degree murder. Defendant asserts that based upon the erroneous instructions, the jury was required to return a verdict of guilt for second degree murder even if the jury agreed that she was likely acting in a state of passion due to adequate provocation.

Defendant's claim that state of passion due to adequate provocation is a partial defense to second degree murder rather than an element of voluntary manslaughter involves an issue of statutory construction, which is a question of law. *See State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020); *State v. Smith*, 436 S.W.3d 751, 761-62 (Tenn. 2014). In construing a statute, this court must "'ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Welch*, 595 S.W.3d at 621 (quoting *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016)). This court first examines "the plain language of the statute to determine the legislature's intent," while giving the statute's words their natural and ordinary meaning. *Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010)). "When those words are clear and unambiguous, we need not consider other sources of information but must simply enforce the statute as written." *Id.* at 249. "If the language is ambiguous, however, we look to the 'broader statutory scheme, the history of the legislation, or other sources to discern its meaning.'" *Smith*, 436 S.W.3d at 762 (quoting *State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009)).

Second degree murder is defined by statute as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Voluntary manslaughter is defined by statute as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Tennessee Code Annotated section 39-11-203(e)(1), upon which Defendant relies, provides that "[a] ground of defense, other than one (1) negating an element of the offense or an affirmative defense, that is not plainly labeled in accordance with this part has the procedural and evidentiary consequences of a defense."

This court has previously examined the statutes defining second degree murder and voluntary manslaughter and determined that the language in the statutes is "clear and unambiguous" and is "devoid of any indication that voluntary manslaughter is a defense or partial defense to the crime of second degree murder." *State v. Paul Clifford Moore, Jr.*, No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *10 (Tenn. Crim. App. May 16, 2016). In *Paul Clifford Moore, Jr.*, this court also stated that section 39-11-203 does not identify state of passion as a defense to either first degree murder or second degree murder and that the provision does "no more than generally describe defenses within the context

of the State's burden of proof." *Id.* This court applied the principles of statutory construction and concluded that "the legislature plainly intended for state of passion produced by adequate provocation to be an element of the separate offense of voluntary manslaughter, not a defense to second degree murder." *Id.*; *see State v. William Langston*, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *12 (Tenn. Crim. App. May 12, 2017) ("[W]e cannot ignore the fact that Tennessee's statutory scheme clearly defines voluntary manslaughter as a separate criminal offense rather than a mere defense to second degree murder.").

Furthermore, the Tennessee Supreme Court has recognized that "state of passion produced by adequate provocation" is an "element" of voluntary manslaughter. *See State v. Williams*, 38 S.W.3d 532, 538-39 (Tenn. 2001). The court in *Williams* compared the statutes setting forth the provisions of second degree murder and voluntary manslaughter and concluded that "the essential element that now distinguishes these two offenses (which are both 'knowing' killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *Id.* at 538 (quoting Tenn. Code Ann. § 39-13-211(a)). The court also referred to state of passion produced by adequate provocation as an "element" of voluntary manslaughter in determining that the revised code abrogated the common law doctrine of mutual combat. *Id.* at 539. This court also has noted that appellate courts "in Tennessee have consistently held that state of passion produced by adequate provocation is an essential statutory element of the offense of voluntary manslaughter and not a mere defense to second degree murder." *Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *14 (citing cases); *see State v. Christopher W. Gadsden*, No. M2019-01385-CCA-R3-CD, 2020 WL 6791251, at *7 (Tenn. Crim. App. Nov. 19, 2020), *perm. app. denied* (Tenn. Mar. 17, 2021); *William Langston*, 2017 WL 1968827, at *13.

Defendant relies upon a recent opinion in *State v. Brandon Scott Donaldson*, in which a panel of this court reviewed the history of homicide offenses in Tennessee, examined the language in *Williams*, and concluded that "[w]hen placed in proper context, the holding in *Williams* cannot be understood to hold that passion induced by provocation became an essential element of the offense of voluntary manslaughter following the 1989 amendment because such treatment would have been a fundamental departure from the historical understanding of the offense." *State v. Brandon Scott Donaldson*, No. E2020-01561-CCA-R3-CD, 2022 WL 1183466, at *23 (Tenn. Crim. App. Apr. 21, 2022), *perm. app. filed* (Tenn. July 7, 2022). This court stated that to hold otherwise "is to say that the court [in *Williams*] intended to turn on its head the historical underpinning of the offense of voluntary manslaughter by way of a single sentence unaccompanied by any analysis of the historical treatment of evidence of passion induced by provocation." *Id.* This court noted that the *Williams* court held "the consequence of its holding was 'simply that *the defendant* may contend that the particular facts concerning the homicide, including proof

of mutual combat, warrant a finding that the killing was the result of adequate provocation, thereby constituting voluntary manslaughter.'" *Id.* (quoting *Williams*, 38 S.W.3d at 539). The court determined that this language in *Williams* demonstrated that "'the passion/provocation formulation' is best treated 'not as a true element of the proscribed offense to be established by the State but rather as a dispensational defense to a defendant who committed an otherwise intentional or knowing killing.'" *Id.* (quoting *State v. Khaliq Ra-El*, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *6 (Tenn. Crim. App. July 11, 2014) (Witt, Jr., concurring in results only).

However, in opinions released both prior to and after the release of *Brandon Scott Donaldson*, this court has recognized that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless or until the Tennessee Supreme Court or the legislature expressly authorizes such treatment. *See, e.g. State v. Jeffrey Lee Potts*, No. M2020-01623-CCA-R3-CD, 2022 WL 2348233, at *20 n.5 (Tenn. Crim. App. June 29, 2022); *William Langston*, 2017 WL 1968827, at *13; *Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *13; *Kaliq Ra-El*, 2014 WL 3511038, at *6. In light of the plain statutory language, designating "state of passion produced by adequate provocation" as an element of the separate offense of voluntary manslaughter rather than a partial defense to second degree murder, and the Tennessee Supreme Court's decision in *Williams*, recognizing the provision as an "element" of voluntary manslaughter, we likewise conclude that "state of passion produced by adequate provocation" cannot be treated as a partial defense to second degree murder until authorized by the legislature or the Tennessee Supreme Court.

In a related claim, Defendant asserts that the trial court erred in instructing the jury that to establish voluntary manslaughter, the element of state of passion had to be proven by the State. Defendant contends that because the State argued against the existence of adequate provocation at trial, "under the instructions as given that was the end of it" and that the jury was never asked to evaluate whether the evidence offered by the defense would establish state of passion. However, since state of passion is an element of the offense of voluntary manslaughter rather than a partial defense to second degree murder, the trial court correctly instructed the jury that the State had the burden of establishing the element beyond a reasonable doubt. *See State v. White*, 362 S.W.3d 559, 566 (Tenn. 2012) (nothing that the State is required to "prove each and every element of a criminal offense beyond a reasonable doubt"). This state of passion element may not be treated otherwise until authorized by the legislature or the Tennessee Supreme Court. *See Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *17-18 (holding that the trial court properly instructed the jury that the State had the burden of proving each element of voluntary manslaughter, including state of passion produced by adequate provocation, beyond a reasonable doubt).

Defendant contends that the jury instructions violated his due process rights based upon the United States Supreme Court's decisions in *Mullaney v. Wilber*, 421 U.S. 684 (1975), and *Patterson v. New York*, 432 U.S. 197 (1977). He asserts that based upon these decisions, "it is clear that the State must prove those facts that are intrinsically and historically part of the charged crime" and that "[t]he legislature cannot, by creative statute-drafting, fundamentally alter that balance." Other than citing to *Patterson* and *Mullaney* in his brief, Defendant includes no discussion regarding the issues raised or the Court's holdings in each of the two cases. Furthermore, neither *Mullaney* nor *Patterson* stand for the proposition claimed by Defendant.

In *Mullaney*, the United States Supreme Court considered a Maine statute on murder, which allowed the State to rest on a presumption of implied malice of aforethought and required the defendant to prove that he acted in the heat of passion on sudden provocation in order to reduce the murder to manslaughter. 421 U.S. at 703. The Court concluded that the statute violated due process principles by distinguishing those who kill in the heat of passion from those who kill in the absence of this factor "while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which it turns." *Id.* at 698. The Court noted that under the statute, "the State has affirmatively shifted the burden of proof to the defendant" and that "[t]he result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction." *Id.* The Court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 704.

In *Patterson*, the Court determined that a New York statute, requiring a defendant in a murder prosecution to prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance to reduce murder to manslaughter, did not violate due process. 432 U.S. at 198-200. The Court concluded that the affirmative defense did not serve to negate any of the facts of the offense which the State must prove to obtain a murder conviction but, instead, was a separate issue on which the defendant carried the burden of persuasion. *Id.* at 206-07. The Court declined to adopt a rule requiring the State to disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses, holding that "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required." *Id.* at 210.

This court has previously rejected a defendant's claim that the jury instructions defining second degree murder and voluntary manslaughter violated due process principles set forth in *Mullaney* and *Patterson*. *See Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *16. Unlike the statutes addressed by the United States Supreme Court, which placed some sort of burden of proof on the defendant, Tennessee statutes define state of passion

produced by adequate provocation as an element of the crime of voluntary manslaughter that the State must prove beyond a reasonable doubt. *Id.*; *see* Tenn. Code Ann. § 39-13-211(a). The jury instructions, which correctly set forth the elements of the offense of voluntary manslaughter, did not violate Defendant's due process rights. *See Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *16.

Finally, Defendant contends that the trial court erred in instructing the jury that it could not consider a conviction for voluntary manslaughter as a lesser included offense unless the jury first acquitted Defendant of second degree murder. Defendant challenges the combination of instructing the jury that second degree murder is an unlawful and knowing killing, that voluntary manslaughter is a lesser included offense of second degree murder and has the additional element of state of passion, and that the jury is permitted to consider lesser included offenses only if the jury first finds Defendant not guilty of the greater offense. Defendant argues that the combination of these instructions "produces the anomalous result that a jury following the instructions can never properly convict of voluntary manslaughter, as it will always return instead a verdict of second-degree murder or a verdict of not guilty of either."

The Tennessee Supreme Court has upheld sequential jury instructions, concluding that their use does not violate a defendant's rights under the Tennessee Constitution and that there are significant policy considerations favoring their use. *State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008). Defendant, however, asserts that the claim of error is not a challenge to the acquittal-first instruction but that "[t]he problem arises from the fact that the … acquittal-first instruction was combined with a so-called lesser-included offense that (contrary to the traditional meaning of a lesser included) actually has more elements rather than fewer elements." *See* Wayne R. LaFave, *et. al.*, 6 Crim. Proc. § 24.8(d) (4th ed.) ("An acquit-first instruction is problematic in a case in which the lesser offense depends upon a finding that the elements of the greater offense have been established, as when extreme-emotional-disturbance manslaughter is available only if the jury found the defendant had committed murder.").

The trial court instructed the jury in accordance with the pattern jury instructions for second degree murder and voluntary manslaughter. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 7.05(a) and 7.06 (21st ed. 2017). After instructing the jury regarding the elements of second degree murder, the trial court instructed the jury regarding the distinction between second degree murder and voluntary manslaughter, and, thus, the jury was aware of the distinction when considering the second degree murder charge. This court has upheld the use of sequential jury instruction where the trial court instructed the jury on the distinction between second degree murder and voluntary manslaughter after the court instructed the jury on the elements of second degree murder. *See, e.g. State v. Jabari Reynolds*, No. E2015-00499-CCA-R3-CD, 2017 WL 936521, at *16-17 (Tenn. Crim. App.

- 32 -

Mar. 9, 2017); *State v. Joseph Hale*, No. M2008-00872-CCA-R3-CD, 2009 WL 1658696, at *10-11 (Tenn. Crim. App. June 15, 2009); *State v. Damien Clark*, No. W2007-00651-CCA-R3-CD, 2009 WL 890886, at *12-13 (Tenn. Crim. App. Apr. 1, 2009). This court also upheld the jury instructions even when the trial court did not instruct the jury on the distinction between voluntary manslaughter and second degree murder until after the court had instructed the jury on the elements of voluntary manslaughter. *See, e.g. William Langston*, 2017 WL 1968827, at *15-16; *Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *18-19; *State v. Chris Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *15-16 (Tenn. Crim. App. Mar. 9, 2011); *State v. Mark Hines*, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *10 (Tenn. Crim. App. Oct. 27, 2010). We conclude that the jury instructions were sufficient for the jury to properly consider second degree murder in relation to the requirements for voluntary manslaughter. Defendant is not entitled to relief regarding this issue.

### 5. The Prosecutor's Comments

Defendant challenges the following comments made by the prosecutor during rebuttal closing arguments:

> ….Isn't voluntary manslaughter. There was no state of passion produced by adequate provocation. She's not out of her mind. She's cool. She's cold.
>
> "Ha-ha. I got you." She's cold, and we know she's not in this state of passion, because as soon as she's out in the car, in the five minutes that it takes to get from there to Cedar Bluff, she's coaching Olia. "Tell the cops this. Tell the cops that." That's not state of passion. That's cool. That's calm. That's reflective. That's not state of passion.
>
> When you go back to deliberate, the judge will give you an instruction about the order of consideration. Second-degree murder is what she's charged with. Before you can go on to any lesser-included offense, you've got to come to—come to an unanimous decision about that, about second.
>
> Look at everything we've put on. There's no self-defense. There's no adequate provocation to justify what she did.

Defendant specifically challenges the prosecutor's statements that she was "not out of her mind," that there was "no adequate provocation to justify what she did," and that the jury could not consider the offense of voluntary manslaughter before reaching a unanimous decision on second degree murder. Defendant asserts that the prosecutor misstated the legal standard in making these statements. The State asserts that Defendant's arguments

are waived, that there was no plain error, and that any impropriety did not affect the verdict. Defendant counters that, although she did not make a contemporaneous objection, she is entitled to plenary review under *State v. Hawkins*, 519 S.W.3d 1, 48 (Tenn. 2017), because she raised the issue in a motion for new trial.

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "'the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *Hawkins*, 519 S.W.3d at 47 (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id*. (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id*. at 47-48 (quoting *Banks*, 271 S.W.3d at 131). "Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id*. (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

The prosecutor's statement regarding the jury's consideration of the second degree murder charge before considering the lesser included offenses was consistent with the trial court's instructions to the jury and a correct reflection of the law. *See Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *18-19. Although the other challenged comments are problematic when viewed in isolation, we cannot conclude that the comments were improper when viewed in the context in which they were made. In stating that Defendant was "not out of her mind," the prosecutor was not suggesting that the jury was required to find some evidence of insanity to convict her of voluntary manslaughter, as Defendant appears to suggest on appeal. Rather, the prosecutor was arguing that Defendant was not acting irrationally but was "cool," "calm," and "reflective" when she stabbed the victim. The prosecutor also did not argue that the presence of adequate provocation would excuse Defendant from criminal liability. Rather, the prosecutor's argument, when viewed in its context, was that the evidence did not establish adequate provocation as to warrant a conviction for voluntary manslaughter. These arguments do not constitute misstatements of the law and are based on reasonable inferences drawn from the evidence. Because the prosecutor's comments were not improper, Defendant has failed to establish that the prosecutor's comments breached a "clear and unequivocal rule of law" as to rise to the level of plain error. *See Smith, 24 S.W.3d at 282*.

### F. Sentencing

Defendant maintains that the trial court erred in imposing an aggregate twenty-eight-year sentence. She argues that the length of the sentence is greater than necessary and is not justly deserved in relation to the seriousness of the offenses. The State responds that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or

enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.*

The standard of review for consecutive sentencing also is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862. The appealing party bears the burden of proving that the sentence was improper. *Carter*, 254 S.W.3d at 344.

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b).

The trial court should impose a sentence which is "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The sentencing laws are intended "to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." Tenn. Code Ann. § 40-35-102(2). The sentence should be "the least severe measure necessary to achieve the purposes for which the sentence is imposed" and it should "be no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2), (4). The trial court should consider the defendant's potential or lack of potential for rehabilitation. Tenn. Code Ann. § 40-35-103(5).

As a Range I standard offender, Defendant was subject to a sentence of fifteen to twenty-five years for second degree murder, a Class A felony, and three to six years for tampering with evidence, a Class C felony. *See* Tenn. Code Ann. §§ 39-13-210(c) (2014);

39-16-503(b); 40-35-112(a)(1), (3). The trial court imposed within-range sentences of twenty-five years for Defendant's second degree murder conviction and three years for her conviction of tampering with evidence. The trial court applied three enhancement factors: (1) Defendant had a "previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (3) the offense involved more than one victim; and (9) Defendant possessed or employed a deadly weapon during the commission of the offense. *See* Tenn. Code Ann. § 40-35-114(1), (3), (9). The trial court assigned varying degrees of weight for each enhancement factor. The trial court applied one mitigating factor in that Defendant "acted under strong provocation" but found that the mitigating evidence was outweighed "by the facts of the case and the enhancement factors." *See* Tenn. Code Ann. § 40-35-113(2). The trial court made extensive findings regarding the circumstances of the offense and determined that the facts of the case were "so egregious" that the enhancement factors and mitigating evidence "sort of pale[d] in comparison." The trial court concluded that the maximum sentence of twenty-five years for the second degree murder conviction was warranted. The trial court examined the evidence related to the conviction of tampering with evidence and determined that the enhancement factors were not sufficient to enhance the sentence for the conviction above the minimum three-year sentence.

The trial court ordered Defendant to serve her sentences consecutively, finding that Defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." *See* Tenn. Code Ann. § 40-35-115(b)(4). The trial court also found that confinement for an extended period of time was necessary to protect society from Defendant's further criminal conduct and that the aggregate length of the sentence was reasonably related to the offenses of which Defendant stood convicted. *See State v. Wilkerson,* 905 S.W.2d 933, 938 (Tenn. 1995).

Defendant does not challenge the trial court's application of enhancement factors or its finding that Defendant met the criteria for a dangerous offender in imposing consecutive sentences. *See* Tenn. Code Ann. § 40-35-115(b)(4). Rather, Defendant asserts that although the trial court "correctly acknowledged that [Defendant] acted after provocation," the trial court "wrongly denigrated that provocation and concluded that this was an extreme form of second-degree murder, deserving of the most severe possible sentence for second-degree murder of twenty-five years." Defendant maintains that "[i]f this was second-degree murder, it was one with an unusually low level of culpability, committed by a defendant who was otherwise not a particularly dangerous offender."

In imposing the sentences, the trial court made extensive findings regarding the facts and circumstances of the case. Although the trial court found that the victim committed an assault against Defendant, the trial court also found a "clear break in the altercation" during

which Defendant "made a separate decision" to attack the victim. The trial court stated that during the initial fight, the victim and Defendant were quickly separated, that "there was a clear break in the violence," that the victim walked away, and that the victim and those in the area believed the violent confrontation had ended. The trial court noted that Defendant "was coming to exact her revenge" on the victim and was "very deceptive in her actions," that Defendant kept her hands down by her side while approaching the victim, that the victim "never saw it coming" and did not act threatening toward Defendant, that Defendant quickly struck the victim before he could "even get his hands up," and that Defendant "went straight for the neck." The trial court found that Defendant's actions "went beyond" a knowing killing and that she intentionally stabbed the victim in the throat in an effort to kill him. The trial court noted that Defendant did not act afraid and did not panic after the stabbing but was "celebrating what she's just accomplished" by laughing, mocking, challenging others, and hanging out of the car window "to give her last retorts" as her friend drove her away from the scene. These findings are supported by the record.

The record reflects that the trial court imposed within-range sentences based upon a proper application of the purposes and principles of sentencing. The trial court's decision is presumed reasonable, and Defendant has failed to establish that the trial court abused its discretion in imposing an effective twenty-eight-year sentence. *See Bise*, 380 S.W.3d at 707.

## G. Cumulative Error

Defendant argues that the cumulative effect of errors committed by the trial court entitles her to relief. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, Defendant has failed to establish any error entitling her to relief when considered either individually or cumulatively.

## III.  Conclusion

Upon reviewing the record, the parties' briefs and oral arguments, and the applicable law, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE